UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

NATIONAL UNION FIRE INSURANCE
COMPANY, a Pennsylvania corporation,

        Plaintiff,

    v.

GREENWICH INSURANCE COMPANY, a
Delaware corporation,

        Defendant.

CASE NO. C07-2065-JCC

ORDER

This matter comes before the Court on Plaintiff's Motion for Summary Judgment ("MSJ") (Dkt. No. 29), Defendant's Response (Dkt. No. 34), and Plaintiff's Reply (Dkt. No. 41); Defendant's Motion for Summary Judgment on Contractual Duties ("Contract MSJ") (Dkt. No. 26), Plaintiff's Response (Dkt. No. 35), and Defendant's Reply (Dkt. No. 40); and Defendant's Motion for Summary Judgment on the Issue of Bad Faith ("Bad Faith MSJ") (Dkt. No. 25), Plaintiff's Response (Dkt. No. 36), and Defendant's Reply (Dkt. No. 39). The Court has carefully considered all these documents, their supporting declarations and exhibits, and the balance of relevant materials in the case file, and has determined that oral argument is not necessary. The Court finds and rules as follows.

ORDER – 1

# I.    FACTUAL BACKGROUND

This case involves a dispute between National Union Fire Insurance Company ("National Union") and Greenwich Insurance Company ("Greenwich")[1] regarding the payment of outstanding defense costs incurred in an underlying action that settled in the midst of trial. National Union has sued Greenwich alleging that it failed to pay its portion of the costs incurred in the defense of their co-insured, Harris Transportation Company ("Harris"), in the matter of *Wright v. Chapman* ("the *Wright* litigation").

The *Wright* litigation arose from a multi-motor vehicle accident that occurred in December 2003. (MSJ 2 (Dkt. No. 29).) A Harris truck was involved in the collision, which resulted in serious injuries to the entire Wright family. (*Id.*) In August 2004, the Wrights sued Harris, which was insured by Greenwich (primary insurer) and National Union (excess insurer). (*See id.*) As the primary insurer, Greenwich retained the law firm of Skellenger Bender ("SB") to defend Harris in the *Wright* litigation, and the case was set for trial in December 2005. (*Id.* at 2–3.) Because the lawsuit had the potential to exceed Greenwich's primary insurance policy limit of $1 million, Harris put National Union on notice of the litigation in January 2005. (MSJ 2–3 (Dkt. No. 29).)

In September of 2005, the parties to the *Wright* litigation engaged in mediation. (Bad Faith MSJ 2 (Dkt. No. 25).) Greenwich did not attend the mediation, and instead gave National Union authority to use Greenwich's full policy limits in settlement negotiations. (*Id.*) At the mediation, National Union offered the Wright plaintiffs $1.25 million ($1 million represented Greenwich's limits, and $250,000 represented National Union's excess coverage layer). The plaintiffs rejected the offer, and ended the mediation by demanding a much higher amount for settlement. (*Id.*)

After the mediation, National Union requested that SB be replaced as defense counsel. (*Id.*) Greenwich contends that National Union wrested control of the case by demanding replacement of SB in

<hr />

[1] National Union is also referred to as "AIG" because it is an AIG company, and Greenwich is also known as "XL" because its administrator is XL Environmental. (*See* Compel Mot. 2 (Dkt. No. 18).) For ease of reference, the Court will simply refer to the parties as National Union and Greenwich.

order to select defense counsel of its choosing. (*Id*. at 3.) National Union asserts that a change in counsel was favored by Harris and precipitated by concerns over whether SB was adequately prepared to proceed to trial. (MSJ 3 (Dkt. No. 29).) Harris' Chief Financial Officer, Jan Frost, states that Harris determined that a change in counsel was necessary to protect its interests and obtain effective representation at trial. (Frost Decl. ¶¶ 13–14 (Dkt. No. 20 at 3).) Regardless, Greenwich does not dispute that it agreed to the substitution of Williams Kastner & Gibbs ("WKG") as defense counsel, subject to certain conditions. (Bad Faith MSJ 3 (Dkt. No. 25).) An email exchange indicates that Greenwich was agreeable to paying WKG the same hourly rate paid to SB if National Union would pay the additional costs associated with WKG's increased billing rates and any costs required to bring WKG "up to speed." (*See* New Counsel emails (Dkt. No. 23 at 9–10).) WKG then took over the defense in the *Wright* litigation and filed a notice of substitution in September 2005. (MSJ 5 (Dkt. No. 29).) Given the short time until the December 2005 trial date, WKG sought and obtained a three month trial continuance. (*Id*.)

Shortly after WKG assumed control of the defense, a billing dispute arose between Greenwich and National Union regarding the payment of WKG's fees. In October 2005, WKG issued an invoice for the time spent in September transitioning the file from SB. (*See* Sept. Invoice (Dkt. No. 30-3 at 53–66).) National Union paid the entire $43,929.42 of this initial invoice as "getting up to speed" costs. (*Id*.) In late November 2005, WKG issued an invoice for fees and costs incurred through October, totaling $195,026.99. (Bad Faith MSJ 3 (Dkt. No. 25).) National Union paid the portion of the bill representing the increased rates charged by WKG, as well as the fees for some of WKG's assistants and the jury consultant. (*See* Dec. 7 email (Dkt. No. 30-2 at 30–31).) After National Union accounted for $30,679.49 of the October bill, the remaining net invoice for $164,347.50 was forwarded to Greenwich for payment. (*See id*.) Greenwich was surprised by the amount of the bill, and declined to pay any of it without having the bill reviewed. (*See* Dec. 8 email (Dkt. No. 30-2 at 36).) After protests by WKG and National Union, Greenwich agreed to pay 50% of the outstanding October bill, which amounted to $82,500, but refused to pay anything more without an audit. (*See* Dec. 22 email (Dkt. No. 30-2 at 49).)

ORDER – 3

In December 2005, Greenwich hired William Leedom as monitoring counsel to assist in resolving the billing dispute. (*Id.*) Mr. Leedom began seeking documents from WKG, including letters of engagement and billing guidelines. (Leedom Dec. 22 email (Dkt. No. 30-2 at 51–52).) WKG expressed concern that the documents requested may be privileged and declined to respond to Mr Leedom's requests. (*See id.*) Greenwich contends that WKG's failure to provide the documents prevented it from undertaking an audit. (Bad Faith MSJ 5 (Dkt. No. 25).)

In January 2006, National Union sent a letter to Greenwich that outlined its position on the billing dispute. (Jan. 6 Letter (Dkt. No. 30-2 at 58–60).) National Union reiterated its request that Greenwich comply with their allocation agreement on defense costs and pay the remainder of the October bill. (*Id.*) National Union also asserted that Greenwich, as the primary insurer, had a contractual obligation to defend the insured and pay Harris' defense costs. (*Id.*) In its response, Greenwich recognized its duty to defend as the primary insurer, but contended that WKG had failed to provide the necessary documents to allow it to perform an audit of the outstanding bill. (Jan. 10 Letter (Dkt. No. 30-2 at 62–64).) Thereafter, Greenwich notified National Union that it would make no further payments to WKG for the defense of Harris in the *Wright* litigation. (Jan. 17 Letter (Dkt. No. 30-3 at 6–7).) Greenwich contended that because National Union "assumed control over Harris' defense," it had assumed the sole responsibility for the cost of defending Harris. (*Id.*)

Despite the protracted billing dispute, WKG continued to defend Harris and the case proceeded to trial. On March 1, 2006, during the second week of trial, the case settled for $3 million. (MSJ 8 (Dkt. No. 29).)[2] At the close of the defense, WKG was owed $498,777.80, including $449,573.08 of which National Union contends is owed by Greenwich pursuant to the parties' allocation agreement. (*Id.*) In December 2006, National Union agreed to pay WKG all outstanding defense invoices in exchange for an assignment of all claims from both Harris and WKG. (Assignment (Dkt. No. 30-3 at 9–11).) National

---

[2] Greenwich exhausted its $1 million primary policy limits in payment toward the $3 million settlement and National Union paid the remainder as the excess insurer. (Compel Mot. 5 (Dkt. No. 18).)

Union then filed this lawsuit against Greenwich alleging, *inter alia*, breach of contract and bad faith.

## II.    ANALYSIS

The parties have filed cross-motions for summary judgment. National Union requests summary judgment awarding it the defense costs incurred in the *Wright* litigation, prejudgment interest and litigation expenses under the *Olympic Steamship* rule. (MSJ 24 (Dkt. No. 29).) Greenwich requests a summary judgment determination on National Union's contractual duties (Contract MSJ 1 (Dkt. No. 26)), and seeks summary judgment dismissal of National Union's bad faith claims (Bad Faith MSJ 3 (Dkt. No. 25).) The Court will address each motion in turn below.

### A.    Request to Strike

As an initial matter, National Union requests that the expert report of Robert Belt, submitted by Greenwich, be stricken from the record and not considered by the Court in ruling on the motions for summary judgment. (MSJ Reply 2 (Dkt. No. 41).) The Federal Rules of Civil Procedure provide that "a party must disclose to the other parties the identity of any witness it may use at trial to present [expert testimony]." FED. R. CIV. P. 26(a)(2)(A). Absent a stipulation otherwise, disclosure of expert testimony must be made "at least 90 days before the date set for trial." FED. R. CIV. P. 26(a)(2)(C). "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or harmless." FED. R. CIV. P. 37(c)(1).

There is no dispute that Greenwich disclosed Robert Belt as an expert witness after the October 26, 2008, expert disclosure cutoff date. Greenwich disclosed Belt for the first time on November 4, 2008, after both parties had filed cross motions for summary judgment. (Expert Disclosure (Dkt. No. 31).) In opposition to National Union's motion for summary judgment, Greenwich relied upon Belt's expert report in support of numerous so-called "reasonable inferences," each of which it contends precludes summary judgment. (*See* MSJ Resp. 4–5 (Dkt. No. 34).) To permit consideration of Greenwich's belated expert report would unfairly prejudice National Union's motion for summary judgment, which justifiably

relied on the absence of any such report. Because National Union's motion for summary judgment was filed after the expert disclosure cutoff date, and was based in part on the absence of any expert report, the Court finds that Greenwich's untimely disclosure cannot be substantially justified or harmless with respect to the motions for summary judgment. *See Nw. Pipeline Corp. v. Ross*, No. C05-1605RSL, 2008 WL 1744617, at *8–10 (W.D. Wash. 2008) ("Rule 37(c)(1)'s exclusionary sanction has been characterized by the Ninth Circuit and the advisory committee as 'automatic' and 'self-executing.'"). Accordingly, the expert report of Robert Belt is hereby STRICKEN from the record and will not be considered by the Court in ruling on the cross motions for summary judgment below.

### B. Summary Judgment Standard

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). A genuine issue of material fact exists where there is sufficient evidence for a reasonable factfinder to find for the nonmoving party. *Anderson*, 477 U.S. at 248. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. The moving party bears the initial burden of showing that there is no evidence which supports an element essential to the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant has met this burden, the nonmoving party then must show that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. If the nonmoving party fails to establish the existence of a genuine issue of material fact, "the moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323–24.

### C. Plaintiff's Motion for Summary Judgment

National Union seeks a summary judgment determination that Greenwich breached its liability

ORDER – 6

insurance contract with its insured when it stopped paying for Harris' defense. (MSJ 1 (Dkt. No. 29).) National Union argues that Greenwich breached its duty to defend Harris in the *Wright* litigation and that National Union is entitled, as an assignee of Harris[3] and under the doctrine of equitable subrogation, to reimbursement for the costs incurred in defending Harris. (*Id.* at 9–18.) National Union contends that Greenwich owes $449,573.08 according to the allocation agreement between the insurers. (*Id.* at 18–21.)

### 1.    Breach of Contract

The interpretation of an insurance policy is a question of law. *Overton v. Consol. Ins. Co.*, 38 P.3d 322, 325 (Wash. 2002). Insurance policies are contracts, which are construed as a whole with the terms interpreted in the way that would be understood by an average person purchasing insurance. *Id.* If the language is clear and unambiguous, the court must enforce it as written and may not create ambiguity where none exists. *Am. Nat'l Fire Ins. Co. v. B&L Trucking & Constr. Co., Inc.*, 951 P.2d 250, 256 (Wash. 1998). The insurer's duty to defend exists where the complaint against the insured, construed liberally, alleges facts which could impose liability upon the insured within the policy's coverage. *Truck Ins. Exch. v. VanPort Homes*, 58 P.3d 276, 281–82 (Wash. 2002). The duty to defend is a valuable service paid for by the insured and one of the principal benefits of the insurance contract. *Safeco Ins. Co. of Amer. v. Butler*, 823 P.2d 499, 504 (Wash. 1992). The insurer is relieved of its duty to defend only if the alleged claim is "clearly not covered by the policy." *VanPort Homes*, 58 P.3d at 282.

The undisputed evidence establishes that Greenwich breached its contractual duty to defend Harris when it stopping paying the costs of Harris' defense. *See* RESTATEMENT (SECOND) OF CONTRACTS § 235 (1981) (breach of contract is the nonperformance of a contractual duty when performance is due). Greenwich's insurance policy with Harris expressly provides:

---

[3] "An assignee steps into the shoes of the assignor, and has all the rights of the assignor." *Estate of Jordan v. Hartford Accident & Indem. Co.*, 844 P.2d 403, 407 (Wash. 1993). Harris assigned to National Union all of its claims against Greenwich relating to or arising out of the *Wright* litigation. (Assignment (Dkt. No. 30-3 at 9–11).) Thus, National Union can assert Harris' rights in this lawsuit for breach of contract, bad faith, and violation of the Washington Consumer Protection Act.

> We have the right and the duty to defend any "insured" against a "suit" asking for damages or a "covered pollution expense." . . . We may investigate and settle any claim or "suit" as we consider appropriate. Our duty to defend or settle ends when the Liability Coverage Limit of Insurance has been exhausted by payments of judgments or settlements.

(Def. Ins. Policy 0687 (Dkt. No. 30-3 at 17).) According to the plain language of the policy, Greenwich's duty to defend Harris continued until its primary coverage limits were paid and exhausted. (*See id.*) This duty to defend necessarily included the duty to *pay for* the defense costs. *See Waite v. Aetna Cas. & Sur. Co.*, 467 P.2d 847, 851–52 (Wash. 1970) (insurer who breaches its duty to defend is required to pay reimbursement for defense costs incurred); *W. Pac. Ins. Co. v. Farmers Ins. Exch.*, 416 P.2d 468, 472 (Wash. 1966) (primary insurer with duty to defend is "liable for the costs of the defense"). Greenwich did not exhaust its policy limits until paying its share of the *Wright* settlement in May 2006. Nevertheless, Greenwich undisputedly stopped paying for Harris' defense soon after WKG took over as counsel and a billing dispute erupted. It is undisputed that Greenwich's policy limits were not "exhausted by payments of judgment or settlements" in January 2006 when it officially notified National Union that it would make no further payments to WKG for Harris' defense. (*See* Jan. 17 Letter (Dkt. No. 30-3 at 6).) Therefore, Greenwich's early termination of financial support for its insured's defense violated its unequivocal duties under the insurance contract with Harris.

In its Response, Greenwich advances one primary argument as to why it did not breach its contractual duty to defend Harris.[4] Greenwich argues that "because Harris suffered no damages by any act or omission alleged on the part of Greenwich/XL, Harris has no breach of contract claim against Greenwich/XL that is assignable to [National Union]." (MSJ Resp. 6 (Dkt. No. 34).) Greenwich essentially argues that it cannot be found to have breached its duty to defend because Harris received an adequate defense and was never billed for the defense costs. The Court disagrees.

First, the record establishes that the billing dispute, precipitated by Greenwich's unwillingness to

---

[4] Greenwich also references arguments from its motions for summary judgment on bad faith and contractual duties. The Court will address these arguments in their respective sections below.

pay, caused harm to Harris. Harris paid insurance premiums to Greenwich in exchange for primary coverage that included a duty to defend. When Greenwich prematurely stopping paying for Harris' defense, Harris did not receive the benefit of the bargained-for exchange, which constitutes damage. *See McRory v. N. Ins. Co. of N.Y.*, 980 P.2d 736, 739 (Wash. 1999) (even though excess insurer paid the defense costs, insured suffered damage by losing the benefit of its bargain with primary insurer who failed to defend it). In December 2005, Harris' broker wrote an email to National Union discussing Harris' view on the defense provided by Rod Umberger of WKG and the impact of the billing dispute:

> The folks at Harris are also very pleased with the work Rob Umberger has done on their behalf. In fact keeping this firm [WKG] retained has now become a time-consuming activity that *occupies Harris' time and resources daily*. My ins'd is in the business of transportation, yet too much of their time has recently been dedicated to wrangling adjusters and ensuring payments are made and ultimately a strong defense is not prejudiced. As you know, Rod Umberger has threatened to walk if his outstanding bills are not paid in full by December 30, 2005.

(Dec. 20, 2005 email (Dkt. No. 25-3 at 15–16) (emphasis added).) Thus, Greenwich's refusal to pay also created uncertainty as to whether WKG would continue to represent Harris and compromised Harris' best interests by occupying its time and resources daily, thereby causing it extra expense.

Second, Greenwich's "no harm, no foul" argument is unsupportable as a matter of public policy and has already been rejected by the Washington Supreme Court. *See McRory*, 980 P.2d at 741 (rejecting insurer's "no damages" argument and explaining that "an insurer who improperly refuses coverage should not profit by the insured's foresight to have other insurance protection"). Greenwich cannot fulfill *its duty* to defend merely by claiming that the insured received an adequate defense paid for by another insurer. Accepting Greenwich's argument would create an untenable incentive for insurance companies to shirk their responsibility to pay defense costs in hopes that another insurer will pick up the bill and absolve it of liability for its failure to defend.

Greenwich's primary policy expressly provides that it had a contractual duty to defend Harris until its limits were paid and exhausted. Greenwich undisputedly terminated payments for Harris' defense prior to the exhaustion of its policy limits. Accordingly, the Court finds that Greenwich breached its

ORDER – 9

contractual duty to defend Harris when it stopped paying for the defense costs.

## 2. Subrogation

Subrogation exists when a party, not a volunteer, pays another's obligation for which the subrogee has no primary liability in order to protect such subrogee's own rights and interests. *Millers Cas. Ins. Co. of Texas v. Briggs*, 665 P.2d 887, 890 (Wash. 1983). There are two different types of subrogation: conventional subrogation, which arises by contract, and equitable subrogation, which arises by operation of law.[5] *Mut. of Enumclaw Ins. Co. v. USF Ins. Co.*, 191 P.3d 866, 874 (Wash. 2008). "[A]n insurer who receives full contractual assignment of an insured's rights may bring a conventional subrogation claim to enforce those rights." *Id.* at 875. Because National Union received a full assignment of rights, it may bring a conventional subrogation claim and assert Harris' claims against Greenwich.

National Union may also pursue remedies under the doctrine of equitable subrogation to recover the costs of defense paid on Harris' behalf. "Equitable subrogation is a legal fiction whereby a person who pays a debt for which another is primarily responsible is subrogated to the rights and remedies of the other." *Truck Ins. Exch. of the Farmer Ins. Group v. Century Indem. Co.*, 887 P.2d 455, 458 (Wash. Ct. App. 1995). In Washington, "[a]n excess insurer has no duty to defend until the primary insurer has exhausted its obligations and is entitled to reimbursement for costs incurred in assuming the defense." *Id.* To hold otherwise would permit the primary carrier to "profit from its wrongful failure to defend." *Id.*

Greenwich first argues that National Union is not entitled to any equitable remedies because it lacked good faith and has "unclean hands." (MSJ Resp. 8–11 (Dkt. No. 34).) Greenwich contends that National Union "formulated a plan to protect its interest, falsely claimed Harris was dissatisfied with SB, had WK appointed counsel, and controlled the litigation from that point forward." (*Id.* at 15.) The record, however, does not substantiate Greenwich's allegations of "unclean hands." First, there is no

---

[5] Both types of subrogation involve the right to reimbursement. *Mahler v. Szucs*, 957 P.2d 632, 640 (Wash. 1998). The difference involves the mechanism for enforcement of this right, which may arise either by contract (conventional subrogation) or by operation of law (equitable subrogation). *Id.*

ORDER – 10

evidence that National Union lied when it asserted that the change in counsel was due to client

dissatisfaction. Harris' CEO, Jan Frost, states in his declaration that Harris did not have "any confidence

that [the lawyer from SB] would be able to effectively represent us at trial," and therefore "[w]e decided

that, in order to protect our interests, it was necessary to change attorneys as soon as possible."[6] (Frost

Decl. ¶¶ 13–14 (Dkt. No. 20 at 3).) Second, regardless of who requested the change in counsel, it is

undisputed that Greenwich "agreed to transfer the file to the [WKG] firm." (Bad Faith MSJ 3 (Dkt. No.

25).) Third, the fact that National Union may have "controlled the litigation" after the change in counsel

is not evidence of "unclean hands," but rather is likely indicative of the differing interests of the two

insurers.[7] Moreover, Greenwich's allegations that National Union wrested control of the case from it are

disingenuous considering that it chose *not* to even attend the mediation and instead gave National Union

authority to negotiate with its full policy limits. (*Id.* at 2.) In short, the Court finds no merit to

Greenwich's allegations that National Union has "unclean hands."

Greenwich also argues that National Union is not entitled to equitable subrogation because it was

acting as a "volunteer" when it paid WKG the outstanding costs of defense. (MSJ Resp. 8–11 (Dkt. No.

34).) "One is a volunteer and not entitled to subrogation if, in making payment, he has no right or interest

of his own to protect and acts without obligation, moral or legal, and without being requested to do so by

a person liable on the obligation." *Hartford Ins. Co. v. Ohio Cas. Ins. Co.*, 189 P.3d 195, 200 (Wash. Ct.

App. 2008). In *Hartford*, the court held that an insurer who paid a settlement on behalf of its insured, a

---

[6] The fact that Mr. Frost, in previous deposition testimony, could not "specifically identify" the concerns that precipitated the change in counsel does not demonstrate that National Union falsely claimed that Harris was dissatisfied. (*See* Frost Dep. 25:1–26:4 (Dkt. No. 34-2 at 6–7).)

[7] As the primary insurer with a duty to defend and policy limit of $1 million, Greenwich had an incentive to settle the case early and minimize its defense costs. (*See* Frost Decl. ¶ 9 (Dkt. No. 20 at 2) ("From Harris' perspective it appeared that Greenwich had decided early on that it was going to have to pay out its $1,000,000 policy limits and, therefore, it should try to minimize defense costs and get the case settled even it meant Harris agreeing to a settlement amount far in excess of the $1,000,000 policy limits.").) Conversely, as the excess insurer, National Union had an incentive to vigorously defend the case and prevent exposure to a large verdict or settlement.

ORDER – 11

defunct limited liability company, did not act as a volunteer and was entitled to reimbursement from another insurer through a subrogation action. *Id.* at 201. Even though the defunct insured may not have been able to assert indemnity or bad faith claims, the paying insurer was not a "volunteer" because nonpayment would have been inconsistent with the insurer's obligation to act in good faith and "overly confident that [it] no longer faced any threat of civil litigation." *Id.* As in *Hartford,* National Union was not acting as a "volunteer" when it paid Harris' outstanding defense costs because it had an obligation to act in good faith and in its insured's best interests. Moreover, as insurer participating in Harris' defense, National Union was acting to protect its own interests against a potential lawsuit to recover the costs of the defense. National Union was not acting as a "volunteer" in paying Harris' defense costs and therefore is entitled to pursue its equitable remedies through subrogation.

Under the principles of equitable subrogation, National Union is entitled to reimbursement from Greenwich for a portion of the outstanding defense costs that it paid. *See Truck Ins. Exch.*, 887 P.2d at 458 ("An excess insurer . . . is entitled to reimbursement for costs incurred in assuming the defense."); *see also Allstate Ins. Co. v. Gip*, 797 F. Supp. 763, 765 (N.D. Cal. 1992) ("An excess insurer possesses a right of reimbursement under equitable principles of subrogation, when it pays an obligation that a primary insurer was obligated to pay."). As the primary insurer, Greenwich had the duty to defend Harris and the primary obligation to pay for Harris' defense costs. *See Truck Ins. Exch.*, 887 P.2d at 458. Because National Union paid Harris' outstanding defense costs, for which Greenwich was primarily responsible, it is entitled to reimbursement to achieve proper allocation of those costs. The remaining issue to be determined is the amount of the defense costs that is properly allocated to Greenwich.

### 3. Allocation Agreement

National Union argues that it has an enforceable allocation agreement with Greenwich under which Greenwich owes $449,573.08 for the outstanding defense costs that it paid. (MSJ 18–21 (Dkt. No. 29).) Washington follows the objective manifestation test for contract formation. *Keystone Land & Dev. v. Xerox Corp.*, 94 P.3d 945, 949 (Wash. 2004). Contract formation under this test requires manifestation

of mutual assent (offer and acceptance) and consideration. *See id.* Mutual assent is determined by "looking to the objective acts or manifestations of the parties rather than the unexpressed subjective intent of any party." *Wilson Court Ltd. P'ship v. Tony Marioni's, Inc.*, 952 P.2d 590, 594 (Wash. 1998). A promise given in exchange for a promise is sufficient consideration to support a contract. *See, e.g., King v. Riveland*, 886 P.2d 160, 164 (Wash. 1994).

The objective acts and manifestations of Greenwich and National Union demonstrate that the parties formed an enforceable contract regarding the allocation of the costs for Harris' defense. Following the unsuccessful mediation, National Union requested a change in counsel. Greenwich was resistant to changing, but admits that it "agreed to a change in defense counsel on certain conditions." (Compel Mot. 2 (Dkt. No. 18 at 2).) Greenwich's Claims Manager, Patty Tyler, proposed those conditions in writing in a September 21, 2005 email:

> I received your voice mail – to clarify *my offer*, *I am agreeable* to continue to pay he [sic] same rates being paid to our current counsel Skellenger Bender of $235/Partner $220/associate $110/paralegal – I will not pay for costs associated with the transfer or for fees for new counsel to review the file and get up to speed.

(New Counsel emails (Dkt. No. 23 at 9–10) (emphasis added).) In this email, Greenwich offered to pay the same hourly rates paid to SB if National Union would pay any additional costs associated with the new counsel. The next day, National Union accepted these conditions in writing, agreeing to pay the additional costs of WKG's increased billing rates and all costs required to bring WKG "up to speed." (*See id.*) Thus, the parties formed a contract by exchanging promises to each pay a specific portion of Harris' defense costs.

The subsequent conduct and communications of the parties confirms that they formed an allocation agreement on defense costs. *See* RESTATEMENT (SECOND) OF CONTRACTS § 19, cmt. a ("Conduct may often convey as clearly as words a promise or an assent to a proposed promise.") In October 2005, WKG issued its first invoice for $43,929.42, which represented the time spent transitioning the file from SB to WKG. (Sept. Invoice (Dkt. No. 30-3 at 53–66).) In accordance with the

ORDER – 13

allocation agreement, National Union paid this entire amount as "getting up to speed" costs. (*See id.*) WKG's second bill totaled $195,026.99 and represented defense costs for the month of October. (*See* Bad Faith MSJ 3 (Dkt. No. 25).) Again, in accordance with the allocation agreement, National Union paid $30,679.49 of the bill, which represented WKG's increased rates as well as other up to speed costs. (*See* Dec. 7 email (Dkt. No. 30-2 at 30–31).) The remaining net invoice for $164,347.50 was forwarded to Greenwich for payment. (*See id.*) Greenwich stated that the bill "may have to be audited considering it's [sic] size," but did not dispute that it had an obligation to pay its portion pursuant to the allocation agreement. (Dec. 8 email (Dkt. No. 30-2 at 36).) As the billing dispute evolved, Greenwich stated its concern that "there is still a great deal of time and expense that has been submitted with this bill that is still 'getting up to speed.'" (Dec. 14 email (Dkt. No. 30-2 at 44).) Thus, Greenwich was operating under the terms of the allocation agreement by recognizing its obligation to pay a portion of the bill while referring to National Union's obligation to pay "getting up to speed" costs.

After protests by WKG and National Union, Greenwich ultimately agreed to pay 50% of the outstanding October bill, which amounted to $82,500, but refused to pay anything more without an audit. (*See* Dec. 22 email (Dkt. No. 30-2 at 49).) This payment confirms that Greenwich understood its obligation to pay Harris' defense costs pursuant to the allocation agreement, but was disputing the amount of WKG's bill and whether the bill comported with its billing guidelines. Notably, Greenwich never once disputed the existence of an allocation agreement during the pendency of the *Wright* litigation. The parties' words and conduct therefore demonstrate the formation of an enforceable contract allocating the costs of Harris' defense.

Greenwich asserts that there is an issue of material fact as to the existence of an allocation agreement because National Union's claims representative, Karen Massie, stated on two occasions that she believed there was no contract between the parties. Under Washington law, however, the objective acts and manifestations of the parties, not their subjective intent, determines the existence of a contract. *See Wilson Court*, 952 P.2d at 594. Because the parties' objective conduct and words demonstrate

ORDER – 14

mutual assent, Ms. Massie's personal belief as to whether a contract was formed is of no consequence.

Greenwich next argues that no allocation agreement exists because "there was no meeting of the minds on the essential terms of the contract."[8] (MSJ Resp. 13 (Dkt. No. 34).) Greenwich contends that the parties never agreed on who was to control the litigation and make strategic decisions, or what billing guidelines would be followed. (*Id.* at 15.) But these terms were not essential to the subject matter of the contract—the allocation of defense costs. The parties agreed to the essential allocation terms when Greenwich agreed to pay the rates paid to prior counsel, "$235/Partner $220/associate $110/paralegal," in return for National Union's promise to pay the additional costs of the new counsel. (New Counsel emails (Dkt. No. 23 at 9–10).) Given the scope of the contract, terms dictating the exact control of the litigation and billing guidelines were not essential to the parties' allocation agreement. *See McEachren v. Sherwood & Roberts*, 675 P.2d 1266, 1268 (Wash. Ct. App. 1984) (the scope of the contract determines what terms are essential). Accordingly, the allocation agreement is an enforceable contract that apportions the legal liability of the parties for the costs of Harris' defense.

Even if the allocation agreement were unenforceable, the principles of equitable subrogation dictate allocating the defense costs according to the terms proposed by Greenwich and accepted by National Union. Subrogation is favored in Washington law and "is always liberally allowed in the interests of justice and equity." *Mahler*, 957 P.2d at 640 (*quoting J.D. O'Malley & Co. v. Lewis*, 18 P.2d 283, 286 (1934)). The essential purpose of subrogation is "to provide for proper allocation of payment responsibility" and "to impose ultimate responsibility for a wrong or loss on the party who, in equity and good conscience, ought to bear it." *Id.* The terms of the allocation agreement here are reasonable and equitable. As the primary insurer, Greenwich undisputedly owed a contractual duty to defend Harris and pay its defense costs until its policy limits were exhausted. National Union did not owe a duty to defend,

---

[8] Greenwich also argues that there is no contract because National Union has "unclean hands." (MSJ Resp. 13–15 (Dkt. No. 34).) As explained above, Court the finds insufficient evidence of "unclean hands" and rejects this argument.

but rather the right to participate in the defense. Thus, Greenwich had the sole responsibility to fund Harris' entire defense. Greenwich's offer to agree on a change in counsel, but only pay the same rates being paid to the current counsel, is reasonable because it had a duty to continue funding Harris' defense. By the same token, National Union's agreement to pay the additional costs associated with new counsel is reasonable because its participation and request for new counsel increased the costs of the defense, for which Greenwich was primarily liable. The terms of the allocation agreement therefore represent a "proper allocation of payment responsibility" by allocating the defense costs between the parties in a just and equitable manner that takes into account their respective obligations to their co-insured.

### 4. Amount of Reimbursement

At the close of the defense, National Union contends that WKG's outstanding invoices totaled $498,777.80, including $449,573.08 of which was owed by Greenwich under the parties' allocation agreement. (MSJ 8, 21 (Dkt. No. 29).) However, National Union has not provided the Court with documentation of WKG's total outstanding invoices of $498,777.80 or how it calculated the $449,573.08 it claims is owed under the allocation agreement.[9] The assignment of rights states that National Union paid WKG "the sum of $449,573.08 in *full payment* of WKG's outstanding invoices for the Wright lawsuit." (Assignment (Dkt. No. 30-3 at 9–11) (emphasis added).) It is not clear from the record whether this payment represented the total amount of the outstanding invoices, or only the remaining amount owed by Greenwich under the allocation agreement. If the latter is true, then National Union should have documentation of separate payment and calculations for its portion of the invoices, which presumably would equal the difference between the total amount owed and the amount owed by Greenwich.

Nevertheless, because the allocation agreement is an enforceable contract, National Union is entitled to reimbursement for the amount paid in Harris' defense that is properly allocated to Greenwich under the agreement. Specifically, Greenwich owes National Union that portion of WKG's outstanding

---

[9] The only WKG invoice provided to the Court is the September invoice, which was paid in its entirety by National Union as "getting up to speed" costs. (*See* Sept. Invoice (Dkt. No. 30-3 at 53–66).)

invoices that reflects hourly billing rates of $235/Partner, $220/Associate, and $110/Paralegal. Moreover, because National Union paid Harris' outstanding defense costs, for which Greenwich was primarily responsible, it has a right to equitable subrogation to achieve proper allocation of those costs. *See Truck Ins. Exch.*, 887 P.2d at 458. The Court finds that the allocation agreement provides a "proper allocation of payment responsibility" under the principles of equitable subrogation. *See Mahler*, 957 P.2d at 640. Accordingly, under the allocation agreement and principles of equitable subrogation, the Court finds, as a matter of law, that National Union is entitled to reimbursement from Greenwich for that portion of WKG's outstanding invoices reflecting hourly billing rates of $235/Partner, $220/Associate, and $110/Paralegal.[10]

### 5. Prejudgment Interest

National Union requests prejudgment interest on the costs incurred in defending Harris. (MSJ 22 (Dkt. No. 29).) An award of prejudgment interest is based on the principle that a defendant "who retains money which he ought to pay to another should be charged interest on it." *Prier v. Refrigeration Eng'g Co.*, 442 P.2d 621, 626 (Wash. 1968). Prejudgment interest is based on the principle of "preventing the unjust enrichment of the defendant who has wrongfully delayed payment." *Polygon Nw. Co. v. Am. Nat. Fire Ins. Co.*, 189 P.3d 777, 794 (Wash. Ct. App. 2008). Prejudgment interest is available when an amount claimed is "liquidated," which occurs where "the evidence furnishes data which, if believed, make it possible to compute the amount with exactness, without reliance on opinion or discretion." *Hansen v. Rothaus*, 730 P.2d 662, 664 (Wash. 1986) (*quoting Prier*, 442 P.2d at 626). The fact that a claim is disputed does not make it "unliquidated" so long as it may be determined by reference to an objective source. *Egerer v. CSR W., LLC*, 67 P.3d 1128, 1133 (Wash. Ct. App. 2003). The touchstone for an

---

[10] The Court cannot fix the specific amount of reimbursement at this time because National Union has not provided evidence or calculations to support the amount it claims is owed under the allocation agreement. This insufficiency does not, however, prevent the Court from finding that National Union is entitled to reimbursement under the terms of the allocation agreement as a matter of law.

ORDER – 17

award of prejudgment interest is that a party has the "use value" of the money improperly withheld. *Mahler*, 957 P.2d at 649.

Here, the allocation agreement between the parties provides an objective source by which National Union's reimbursement can be ascertained without the exercise of discretion. Greenwich's responsibility for defense costs under the agreement can be determined with precision by multiplying the agreed upon hourly rates of $235/Partner, $220/Associate, and $110/Paralegal against the respective hours billed in WKG's outstanding invoices. National Union's claim for reimbursement for defense costs is therefore "liquidated," and an award of prejudgment interest is warranted. Moreover, because Greenwich stopped paying defense costs, it retained the "use value" of money that should have been used to fulfill its duty to defend. Prejudgment interest is particularly appropriate here to prevent Greenwich from being unjustly enriched for its wrongful refusal to pay its insured's defense costs. *See Polygon Nw.*, 189 P.3d at 794 ("[A]n award of prejudgment interest is in the nature of preventing unjust enrichment of the defendant who has wrongfully delayed payment."). Accordingly, the Court finds that Greenwich owes prejudgment interest on its allocated portion of the defense costs accrued since December 28, 2006, the date that National Union paid WKG's invoices in full on Harris' behalf. (*See* Assignment (Dkt. No. 30-3 at 9–11).)

### 6.     Attorney Fees

Under Washington law, an insured who successfully sues an insurer to obtain insurance coverage is entitled to an award of attorney fees. *Olympic S.S. Co., Inc. v. Centennial Ins. Co.*, 811 P.2d 673, 681 (Wash. 1991). In *Olympic Steamship*, the Washington Supreme Court held that "an award of fees is required in any legal action where an insurer compels the insured to assume the burden of legal action, to obtain the full benefit of his insurance contract . . . ." *Id.* This entitlement to attorney fees arises, in part, from "the insurer's enhanced fiduciary duty not to put its financial interests above those of the insured." *McRory*, 980 P.2d at 738. The *Olympic Steamship* rule has since been extended to permit an insured's assignee to recover attorney fees when it is compelled to sue an insurer to secure coverage. *Estate of*

ORDER – 18

*Jordan v. Hartford Accident & Indem. Co.*, 844 P.2d 403, 413–14 (Wash. 1993). An award of attorney fees is limited, however, to circumstances where "the insured litigates an issue of coverage, but not if the issue is merely about the value of a claim." *Leingang v. Pierce County Med. Bureau, Inc.*, 930 P.2d 288, 295 (Wash. 1997). "Coverage disputes include both cases in which the issue of any coverage is disputed and cases in which the 'extent of the benefit provided by an insurance contract' is at issue." *Id.* (citation omitted).

The arguments presented in Greenwich's pleadings demonstrate that, at bottom, coverage for Harris' outstanding defense costs is in dispute. Rather tellingly, Greenwich describes its motion for summary judgment on contractual duties as requesting "a ruling on summary judgment that it owes no *contractual duty to pay the outstanding defense costs* . . . due to Section II.C of the [National Union] Policy, as well as the 'other insurance' clause of the Greenwich Policy." (MSJ Resp. 5–6 (Dkt. No. 34) (emphasis added).) In other words, Greenwich contends that the outstanding defense costs are *not covered* by its policy by operation of (1) its "other insurance" clause and (2) a provision in National Union's policy. Greenwich does not admit that National Union is entitled to reimbursement and dispute only the amount of reimbursement. Instead, Greenwich advances multiple theories as to why the outstanding costs of defense are beyond the scope of its insurance policy. *See Leingang*, 930 P.2d at 295 (attorney fees warranted where "insurer admitted there was some coverage but disputed the scope of coverage"). For example, Greenwich expressly "denies that its policy provides *coverage of any sort* for attorney fees and costs incurred because of [National Union's] choice to 'participate' in Harris' defense." (Contract MSJ Reply 8 (Dkt. No. 40) (emphasis added).) Greenwich also asserts that its coverage for defense costs is excess over the National Union policy by operation of Greenwich's "other insurance" clause.[11] (*Id.* at 7.) Greenwich is contesting and litigating whether it has a contractual duty to pay defense costs. In light of these arguments, Greenwich's assertion that coverage is not in dispute is without merit.

---

[11] Greenwich has apparently abandoned this argument. (Contract MSJ Reply 7 (Dkt. No. 40).)

Here, Harris' assignee was compelled to bring suit to obtain reimbursement for defense costs incurred as a result of Greenwich's failure to honor its duty to defend. This lawsuit involves a coverage dispute, and therefore, National Union is entitled to reasonable attorney fees.[12]

**B.    Defendant's Motion for Summary Judgment on Plaintiff's Contractual Duties**

Greenwich asks the Court to make the following findings as a matter of law: (1) National Union's policy with Harris enabled it to participate in Harris' defense, (2) National Union did participate in Harris' defense, (3) National Union has an obligation to pay for its participation, and (4) National Union's independent obligation is not affected by any allocation agreement. (Contract MSJ 1–2 (Dkt. No. 26).) The first two proposed findings are undisputed. The Court finds that National Union was entitled to participate in Harris' defense, and did in fact do so. (*See* Contract MSJ Resp. 1 (Dkt. No. 35).) These findings, however, do not lead to the conclusion that National Union's participation as an excess insurer somehow relieved Greenwich of its duty to pay any further defense costs as the primary insurer.

Greenwich states that its motion, "requests no more than this—that the Court should make the legal determination that coverage is available under [National Union's policy], and that the issue of the amount of indemnity owed by [National Union] should go to the jury." (Contract MSJ Reply 6 (Dkt. No. 40).) The Court denies these requests. First, the Court's finding that Nation Union is entitled to reimbursement according to the terms of the allocation agreement disposes of Greenwich's request to send this issue to the jury. Second, as will be discussed below, whether National Union's policy provided coverage *to Harris* for costs associated with its participation is neither relevant nor determinative of the issues presented in this case. Ultimately, Greenwich's motion rests on the flawed assumption that National Union's participation, through agreed upon counsel, abrogated Greenwich's primary duty to pay

---

[12] The Court's previous Order denying attorney fees requested by Harris, (Nov. 25 Order 7 (Dkt. No. 43)), does not control here. First, Harris had assigned all its rights arising out of the *Wright* litigation to National Union, and thus was not the party compelled to bring suit to secure coverage. Second, the previous Order addressed a discovery dispute and did not examine the parties' arguments for summary judgment, which reveal that the case does, in fact, involve a coverage dispute.

ORDER – 20

Harris' defense costs.[13]

As an initial matter, Greenwich has no legal basis to rely on the insurance contract between National Union and Harris to address its contractual duty to defend—the issue in this lawsuit. Greenwich is not a party to National Union's policy with Harris, and has no justification to rely on the policy's provisions in determining its independent contractual duty to pay for Harris' defense. Unlike National Union, Greenwich is not an assignee of Harris and therefore cannot assert Harris' rights under National Union's policy. Similarly, Greenwich has made no payments on behalf of Harris for which another is primarily liable such that it could assert a subrogation claim. Absent status as an assignee or subrogee, Greenwich has no basis to assert Harris' contractual rights.

The relevant contractual issues presented in this lawsuit involve whether Greenwich's refusal to pay the outstanding costs of Harris' defense breached its contractual duty to Harris or an allocation agreement with National Union.[14] The provisions of National Union's excess policy are not relevant to these determinations because "an insurer who has a contractual duty to defend continues to have that duty *regardless of the existence of other insurance*, and may be liable for breach of contract for wrongfully refusing to aid in that defense." *Valley Ins. Co. v. Wellington Cheswick, LLC*, No. C05-1886RSM, 2007 WL 858362, at *1 (W.D. Wash. 2007) (emphasis added); *see W. Pac. Ins.*, 416 P.2d at 472 (insurer has a direct contractual obligation to its insured regardless of the existence of other insurance); *Clow v. Nat'l Indem. Co.*, 339 P.2d 82, 87 (Wash. 1959) (same). In *Western Pacific*, the Washington Supreme Court held that the excess insurer, Western, was entitled to reimbursement for the

---

[13] Greenwich describes the instant motion as requesting "a ruling on summary judgment that it owes no contractual duty to pay the outstanding defense costs." (MSJ Resp. 5–6 (Dkt. No. 34).)

[14] In this suit, National Union, as an assignee of Harris, alleges breach of insurance contract, bad faith, and violation of the Washington Consumer Protection Act. (Compl. ¶¶ 25–36 (Dkt. No. 1).) In addition, National Union alleges its own claims for breach of the allocation contract and equitable subrogation. (*Id.* at ¶¶ 37–45.) In its Answer, Greenwich asserted affirmative defenses to these claims but did not assert any counterclaims. (*See* Ans. (Dkt. No. 8).)

costs of defending the insured against a claim for which the primary insurer, Farmers, was liable. 416 P.2d at 472. There, Western undertook the costs of defense pursuant to a contractual duty to defend provided in its excess policy. *Id.* Nevertheless, the court found that because Farmers was the primary insurer on the claim, it was "liable for the costs of the defense" and Western was entitled to reimbursement. *Id.* The court explained that because Farmer's obligations "were outstanding regardless of the existence of other insurance," it could not "stand aloof from the pending lawsuit upon the basis of a unilateral determination that the provisions and exclusions of its policy might relieve it of liability." *Id.* Under similar reasoning, Greenwich was not entitled to stop paying for its insured's defense based on its unilateral determination that National Union's participation absolved it of a duty to pay defense costs.

Greenwich asserts that National Union's policy requires it to pay the costs of defense because it participated in Harris' defense. (Contract MSJ 3 (Dkt. No. 26).) National Union's policy provides:

> [W]e will not be obligated to assume charge of the investigation, settlement or defense of any claim made, suit brought or proceeding instituted against the Insured. We will, however have the right and shall be given the opportunity to participate in the defense and trial of any claims, suits or proceedings relative to any Occurrence, which in our opinion, may create liability on our party under the terms of this policy. If we exercise such right, we will do so at our own expense.

(Pl. Ins. Policy 2 (Dkt. No. 26-2 at 7).) But insurance policies cannot be interpreted in a vacuum and must instead be interpreted "in light of the total insuring intent of all the parties" and in consideration of "the nature and purpose of primary and excess insurance policies." *Safeco Ins. Co. of Ill. v. Auto. Club Ins. Co.*, 31 P.3d 52, 57 (Wash. 2001). The purpose of this clause is to protect National Union's right to participate in the defense and *protect the insured* from bearing any additional costs as a result of such participation. Even assuming, *arguendo*, that National Union's policy created an obligation vis-à-vis Greenwich to pay any additional costs associated with its participation, the enforceable allocation agreement between the insurers accounts for these costs. The clause does not, however, suspend Greenwich's duty to pay any further defense costs merely because National Union exercised its right to participate in the defense.

ORDER – 22

In addition, Greenwich's attempt to rely on National Union's excess policy to relieve Greenwich of its obligation to pay defense costs ignores the fundamental difference between primary and excess insurance coverage. Under Washington law, it is "well established that the liability of the excess insurer does not arise until after the limits of the coverage under the primary policy have been exceeded." *Millers*, 665 P.2d at 890; *U.S. Fire Ins. Co. v. Roberts & Schaefer Co.*, 683 P.2d 600, 603 (Wash. Ct. App. 1984) ("[T]he excess insurer's duty to defend does not arise until the primary insurer has exhausted its obligation."); *Truck Ins. Exch.*, 887 P.2d at 458 (same). In *Millers*, the Washington Supreme Court affirmed the subrogation award of an excess insurer, Pemco, against the primary insurer, Millers. 665 P.2d at 890. Millers had argued that Pemco's payment of the insured's liability was in satisfaction of Pemco's separate obligations under the excess policy, thereby relieving Millers of liability. *Id.* The court flatly rejected this argument as ignoring "the responsibilities and relationships of the two insurers," and found that because Millers was primarily liable, Pemco was entitled to reimbursement. *Id.* Here, the Court rejects Greenwich's similar attempt to abandon its contractual duty, as the primary insurer, to its insured by relying on purported obligations owed by the excess insurer. National Union's obligations to Harris did not suspend or affect Greenwich's independent duties under its primary insurance policy with Harris or its allocation agreement with National Union. Greenwich's motion for summary judgment on National Union's contractual duties is therefore DENIED.

### C. Defendant's Motion for Summary Judgment on the Issue of Bad Faith

Greenwich requests that this Court find that National Union cannot prevail on its bad faith claim as a matter of law. (Bad Faith MSJ 1 (Dkt. No. 25).) To establish a bad faith claim, a plaintiff must present evidence that the insurer's action was "unreasonable, frivolous, or unfounded." *Kirk v. Mt. Airy Ins. Co.*, 951 P.2d 1124, 1126 (Wash. 1998). The determination of whether an insurer acted in bad faith is a question of fact. *Smith v. Safeco Ins. Co.*, 78 P.3d 1274, 1277 (Wash. 2003). An insurer is entitled to dismissal of a bad faith claim on summary judgment "only if there is no disputed material facts pertaining to the reasonableness of the insurer's conduct under the circumstances." *Id.* The Court's finding that

Greenwich breached its contractual duty to defend Harris when it stopped paying for Harris' defense is dispositive of the instant motion. Greenwich's breach of its contractual duty to defend Harris raises sufficient issues of material fact on the reasonableness of its conduct to preclude summary judgment dismissal of National Union's bad faith claim. Greenwich's motion for summary judgment on the issue of bad faith is therefore DENIED.

## III.  CONCLUSION

For the foregoing reasons, the Court hereby finds and rules as follows:

(1)     Plaintiff's Motion for Summary Judgment (Dkt. No. 29) is hereby GRANTED. The Court finds that (a) Greenwich breached its duty to defend Harris, (b) National Union is entitled to reimbursement under equitable subrogation, and (c) Greenwich and National Union formed an enforceable contract on the allocation of the costs for Harris' defense, which includes the term that Greenwich will pay defense costs at hourly billing rates of $235/Partner, $220/Associate, and $110/Paralegal. Therefore, National Union is entitled, pursuant to the allocation agreement and equitable subrogation, to reimbursement for the costs of defense according to the terms of the allocation agreement. In addition, National Union is entitled to prejudgment interest on such reimbursement, and National Union is entitled to reasonable attorney fees.

(2)     Defendant's Motion for Summary Judgment on Contractual Duties (Dkt. No. 26) is hereby DENIED.

(3)     Defendant's Motion for Summary Judgment on the Issue of Bad Faith (Dkt. No. 25) is hereby DENIED.

SO ORDERED this 2nd day of February, 2009.

John C. Coughenour
UNITED STATES DISTRICT JUDGE

ORDER – 24