1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT
                          WESTERN DISTRICT OF WASHINGTON
9                                   AT SEATTLE

10

11   NATIONAL UNION FIRE INSURANCE
     COMPANY, a Pennsylvania corporation,

12                  Plaintiff,                        CASE NO. C07-2065-JCC

13        v.                                          ORDER

14   GREENWICH INSURANCE COMPANY, a
     Delaware corporation,
15

16                  Defendant.

17

18        This matter comes before the Court on Plaintiff's Motion for Summary Judgment Re:

19   Recoverable Defense Costs, Bad Faith and CPA Violations ("Pl. MSJ") (Dkt. No. 68), Defendant's

20   Response (Dkt. No. 72), and Plaintiff's Reply (Dkt. No. 76); Defendant's Motion for Summary Judgment

21   Dismissal of Remaining Claims ("Def. MSJ") (Dkt. No. 67), Plaintiff's Response (Dkt. No. 73), and

22   Defendant's Reply (Dkt. No. 75). The Court has carefully considered all these documents, their

23   supporting declarations and exhibits, and the balance of relevant materials in the case file, and has

24   determined that oral argument is not necessary. The Court finds and rules as follows.

25

26   ORDER – 1

## I.    FACTUAL BACKGROUND

The parties and the Court are familiar with the facts of this case and the Court need not repeat many of them here.[1] This case involves a dispute between National Union Fire Insurance Company ("National Union") and Greenwich Insurance Company ("Greenwich") regarding the payment of outstanding defense costs incurred in an underlying action that settled in the midst of trial. National Union has sued Greenwich alleging that it failed to pay its portion of the costs incurred in the defense of their co-insured, Harris Transportation Company ("Harris"), in the underlying *Wright* litigation.

In December 2006, National Union obtained an assignment of rights from both Harris, the joint insured, and Williams Kastner & Gibbs ("WKG"), Harris's defense counsel in the underlying litigation. (Assignment (Dkt. No. 30-3 at 9–11).) National Union paid WKG all outstanding costs of defense in exchange for an assignment of all claims from Harris and WKG. (*Id.*) In December 2007, National Union filed this suit against Greenwich alleging, *inter alia*, breach of contract, bad faith, and violation of the Washington Consumer Protection Act ("CPA"). (*See* Compl. (Dkt. No. 1).)

In October 2008, the parties filed cross-motions for summary judgment. National Union sought summary judgment awarding it the defense costs incurred in the *Wright* litigation, prejudgment interest, and attorney fees under the *Olympic Steamship* rule. (Dkt. No. 29.) Greenwich requested a summary judgment determination on National Union's contractual duties (Dkt. No. 26), and sought summary judgment dismissal of National Union's bad faith claims (Dkt. No. 25).

The Court granted National Union's motion and denied Greenwich's motions. (Feb. 2009 Order 24 (Dkt. No. 64).) In granting National Union's motion, the Court ruled that Greenwich, as the primary insurer, breached its contractual duty to defend Harris, and that National Union was entitled to reimbursement from Greenwich pursuant to the parties' allocation agreement on the costs of defense. (*Id.* at 7, 17.) The Court also ruled that National Union was entitled to prejudgment interest on the

---

[1] A detailed account of the facts is provided in the Court's Order of February 2, 2009. (*See* Dkt. No. 64 at 2–5.)

ORDER – 2

reimbursement, and to reasonable attorney fees. (*Id.* at 18–20.) In denying Greenwich's motion on the issue of bad faith, the Court ruled that its finding that Greenwich breached a contractual duty to defend Harris raised sufficient issues of material fact on the reasonableness of Greenwich's conduct to preclude dismissal of National Union's bad faith claim. (*Id.* at 23–22.)

The parties have, once again, filed cross-motions for summary judgment. National Union seeks a determination, pursuant to the Court's previous ruling, of the amount of reimbursement to which it is entitled. (Pl. MSJ 1 (Dkt. No. 68).) National Union also seeks a summary judgment determination on its bad faith CPA claims. (*Id.* at 2.) In light of the Court's award of reimbursement, Greenwich requests summary judgment dismissal of National Union's remaining claims of bad faith and violation of the CPA. (Def. MSJ 1 (Dkt. No. 67).) The Court will address each motion in turn.

## II.    LEGAL STANDARD

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). A genuine issue of material fact exists where there is sufficient evidence for a reasonable factfinder to find for the nonmoving party. *Anderson*, 477 U.S. at 248. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. The moving party bears the initial burden of showing that there is no evidence which supports an element essential to the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant has met this burden, the nonmoving party then must show that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. If the nonmoving party fails to establish the existence of a genuine issue of material fact, "the moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323–24.

ORDER – 3

**III.    ANALYSIS**

**A.    Plaintiff's Motion for Summary Judgment**

National Union requests a ruling that it is entitled to recover defense costs from Greenwich in the amount of $530,760.42, which represents $445,690.58 in costs paid to WKG and $85,069.84 in defense costs incurred on Harris's behalf and paid directly to vendors. (Pl. MSJ 1 (Dkt. No. 68).) National Union also seeks a determination that Greenwich's conduct constituted bad faith and violated the CPA.[2] (*Id.* at 2.) Because the sole issue presented by Greenwich's motion for summary judgment is the remaining validity of National Union's bad faith and CPA claims, the Court reserves its discussion on these issues for Section III.B below, and focuses the instant discussion of Plaintiff's motion on the amount of reimbursement owed by Greenwich.

**1.    Amount Owed on WKG Invoices**

In its February 2009 Order, the Court ruled that the parties formed an enforceable contract regarding the allocation of costs for Harris's defense. (Feb. 2009 Order 13 (Dkt. No. 64).) Under the terms of that allocation agreement, Greenwich agreed to pay hourly rates of $235/Partner, $220/Associate, and $110/Paralegal, and National Union agreed to pay the additional costs of WKG's increased billing rates and all costs required to bring WKG "up to speed." (*Id.* at 13–14.) The Court further ruled, "Even if the allocation agreement were unenforceable, the principles of equitable subrogation dictate allocating the defense costs according to the terms proposed by Greenwich and accepted by National Union." (*Id.* at 15.) Accordingly, the Court found, as a matter of law, that "under the allocation agreement and principles of equitable subrogation, . . . National Union is entitled to reimbursement from Greenwich for that portion of WKG's outstanding invoices reflecting hourly billing

---

[2] In its Reply, National Union argues that the expert report of Karen Southworth, submitted by Greenwich, should be stricken because she is not qualified and because her report offers impermissible opinions on ultimate issues of law. (Reply 1–4 (Dkt. No. 76).) The Court finds that this issue would be more appropriately addressed by a motion in limine, if the case were to proceed to trial. At this stage, the Court considers the expert report, but in any event, does not find the report particularly persuasive.

ORDER – 4

rates of $235/Partner, $220/Associate, and $110/Paralegal." (*Id.* at 17.) However, the Court was unable

to fix the specific amount of reimbursement at the time of the February 2009 Order because National

Union did not provide sufficient documentation or calculations to support the amount it claimed is owed

by Greenwich under the terms of the allocation agreement. (*Id.* at 16–17 n.10.)

Now, in support of the instant motion, National Union provides specific documentation of the

defense costs it paid and the calculations for the amount owed by Greenwich under the parties' allocation

agreement. (Pl. MSJ 2–4 (Dkt. No. 68).) National Union provides four invoices issued by WKG between

November 2005 and September 2006 for Harris's defense. (Invoices (Dkt. Nos. 69-2–69-5).) National

Union also provides calculations, applying the hourly rates in the allocation agreement to each invoice, to

determine the remaining net invoice amount for which Greenwich is responsible. (*See id.* (Dkt. No. 69-2

at 1–10); Southard Decl. ¶¶ 6–10 (Dkt. No. 69 at 3–4).) In response, Greenwich does not dispute or

otherwise challenge National Union's calculation of the WKG attorney fees it owes to National Union

under the allocation agreement. Based on the invoices issued by WKG, the relative payments made by the

parties, the remaining net invoice amounts, and the terms of the allocation agreement, Greenwich owed

$445,690.58 in defense costs to WKG following the resolution of the *Wright* litigation. The Court

therefore finds that, pursuant to the allocation agreement and principles of equitable subrogation,

Greenwich owes National Union $445,690.58, plus prejudgment interest.[3]

### 2.     Amount Owed for Additional Defense Costs Paid to Vendors

In addition to the defense costs it paid to WKG, National Union requests reimbursement for

amounts it paid directly to various vendors that provided services for Harris's defense. (Pl. MSJ 8–9

(Dkt. No. 68).) These costs were incurred for services necessary for Harris's defense, including expert

---

[3] For the reasons explained in the Court's February 2009 Order, National Union is entitled to prejudgment interest on the allocated portion of the defense costs owed by Greenwich, accruing since December 28, 2006, the date that National Union paid WKG's invoices in full. (Feb. Order 17–18 (Dkt. No. 64).) Greenwich does not dispute, and the Court has no basis to doubt, National Union's calculation of the amount of prejudgment interest accruing on WKG invoices. (*See* Pl. MSJ 8 (Dkt. No. 68).)

witness services, court reporter services at depositions, medical records retrieval, trial support services, and mediator services. (*See* Dkt. Nos. 69-7–69-9.) In total, National Union paid an additional $85,068.84 in defense costs to vendors that were neither paid for by Greenwich nor billed or paid for by WKG. (Pl. Reply 6–7 (Dkt. No. 76).) National Union argues that, because these vendor costs were incurred on Harris's behalf before Greenwich exhausted its obligations as the primary insurer, National Union is entitled to reimbursement for these costs under the doctrine of equitable subrogation. (*Id.*)

As the primary insurer, Greenwich undisputedly owed a contractual duty to defend Harris and pay defense costs until its policy limits were exhausted, which did not occur until it paid its share of the *Wright* settlement in May 2006. *See Truck Ins. Exch. of the Farmer Ins. Group v. Century Indem. Co.*, 887 P.2d 455, 458 (Wash. Ct. App. 1995). On the other hand, as the excess insurer, National Union's duty to defend did not arise until Greenwich exhausted its primary policy limits. *See id.* ("An excess insurer has no duty to defend until the primary insurer has exhausted its obligations . . . ."); *Rees v. Viking Ins. Co.*, 892 P.2d 1128, 1129 (Wash. Ct. App. 1995) ("An excess carrier's obligation to pay and defend begins when, and only when, the limits of the primary insurance policy are exhausted."). By virtue of the parties' allocation agreement, National Union became responsible for paying the costs of WKG's increased billing rate (as compared to the billing rate of prior defense counsel) and the costs required to bring WKG up to speed on the file. But this agreement did not allocate, or even address, other costs related to Harris's defense not provided by WKG. Nor did the agreement relieve Greenwich of its duty to defend as the primary insurer since its policy limits had not yet been exhausted. *Cf. Weyerhaeuser Co. v. Commercial Union Ins. Co.*, 15 P.3d 115, 135 (Wash. 2000) (noting that even a "tendering of policy limits does not abrogate [a primary] insurer's duty to defend"). The mere fact that the parties formed an agreement to allocate future defense costs *billed by WKG* did not abrogate Greenwich's duty to pay for other costs related to Harris's defense. Consequently, Greenwich remained primarily responsible for vendor costs related to Harris's defense because such costs were not otherwise specifically allocated to National Union under their agreement.

ORDER – 6

1    Greenwich argues that National Union cannot recover the vendor costs under equitable

2    subrogation because, according to Greenwich, "the Court has carefully considered the issue, and limited

3    [National Union's] equitable contribution rights to the WKG attorney billing rates." (Def. Resp. 7–8

4    (Dkt. No. 72).) Greenwich's argument is unavailing.

5    The Court did not "limit" National Union's equitable subrogation rights in finding that it was

6    entitled to reimbursement pursuant to the terms of the allocation agreement. Rather, the Court found that

7    the allocation agreement was an enforceable contract, the essential terms of which required Greenwich to

8    pay defense costs at a particular billing rate. (Feb. 2009 Order 13–15 (Dkt. No. 64).) The Court also

9    found that equitable subrogation provided an *independent basis* to allocate the costs of defense according

10   to the terms proposed by the parties, even if the allocation agreement was unenforceable. (*Id.* at 15.) This

11   finding did not suggest that the hourly billing rates in the allocation agreement were the *only* defense

12   costs for which Greenwich could be held liable as the *primary* insurer. Greenwich undisputedly had the

13   primary duty to defend during the time the vendor costs were incurred for Harris's defense, and

14   therefore, such costs are properly borne by Greenwich as the primary insurer. *See Weyerhaeuser*, 15 P.3d

15   at 135 ("If an excess insurer were required to defend before exhaustion of an underlying carrier's duty,

16   then the primary carrier would profit from its wrongful failure to defend.") (internal quotation and

17   citation omitted).

18   Because Greenwich was primarily responsible for the costs of vendor services related to Harris's

19   defense, and because National Union paid those costs on Harris's behalf, the doctrine of equitable

20   subrogation entitles National Union to reimbursement for such costs. *See N.H. Indem. Co. v. Budget

21   Rent-A-Car Sys. Inc.*, 64 P.3d 1239, 1243 (Wash. 2003) ("[I]f a primary insurer fails to assume the

22   defense, for any reason, the secondary insurer . . . should be entitled to recoup its costs from the primary

23   insurer."); *Truck Ins. Exch.*, 887 P.2d at 458 ("An excess insurer . . . is entitled to reimbursement for

24   costs incurred in assuming the defense."). The Court therefore finds that National Union is entitled to

25   reimbursement of $85,068.84, plus prejudgment interest, to recover amounts it paid to vendors that

26   ORDER – 7

1  provided services related to Harris's defense.

2      **B.      Defendant's Motion for Summary Judgment**

3      Greenwich moves for summary judgment dismissal of National Union's remaining claims for bad

4  faith and violation of the CPA. (Def. MSJ 1 (Dkt. No. 67).) Greenwich argues that, because the Court

5  granted National Union summary judgment on its contractual claim and awarded it contractual damages,

6  prejudgment interest, and attorney fees, there are no remaining damages that could support its bad faith

7  and CPA claims. (*Id.* at 6–10.)

8      **1.      Harm is an Essential Element of a Bad Faith or CPA Claim**

9      Bad faith handling of an insurance claim is a tort analyzed under general tort principles: the

10  existence of a duty, breach of that duty, and damages proximately caused by the breach. *Mut. of*

11  *Enumclaw Ins. Co. v. Dan Paulson Constr. Inc.*, 169 P.3d 1, 8 (Wash. 2007). To prove that the insurer

12  acted in bad faith, the insured must show the insurer's breach was "unreasonable, frivolous, or

13  unfounded." *Kirk v. Mt. Airy Ins. Co.*, 951 P.2d 1124, 1126 (Wash. 1998). A Washington CPA claim

14  requires a showing of (1) an unfair or deceptive practice, (2) in trade or commerce, (3) that impacts the

15  public interest, (4) which causes injury to the party in his business or property, and (5) which injury is

16  causally linked to the unfair or deceptive act. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins.*

17  *Co.*, 719 P.2d 531, 533 (Wash. 1986). Thus, "[h]arm to the insured is an essential element of every bad

18  faith or CPA claim." *Werlinger v. Clarendon Nat'l Ins. Co.*, 120 P.3d 593, 595 (Wash. Ct. App. 2005);

19  *see Van Noy v. State Farm Mut. Auto. Ins. Co.*, 983 P.2d 1129, 1135 (Wash. Ct. App. 1999) ("Without

20  proving harm, there is no violation of the CPA or bad faith claim[].").

21      In the third-party context,[4] harm is presumed where an insurer acts in bad faith. *Safeco Ins. Co. of*

22

23      [4] The instant dispute involves third-party insurance coverage, which indemnifies an insured for
covered claims that other third-party claimants file against her. *Dan Paulson*, 169 P.3d at 8 n.8. By
24  contrast, first-party coverage pays specified benefits directly to the insured when a determinable
contingency occurs, allowing an insured to make her own personal claim for payment against her insurer.
25  *Id.*

26  ORDER – 8

*Am. v. Butler*, 823 P.2d 499, 506 (Wash. 1992). However, "the insurer can rebut the presumption by showing by a preponderance of the evidence its acts did not harm or prejudice the insured." *Id.* "[B]ecause harm is an essential element, summary judgment in favor of the insurer is appropriate if a reasonable person could conclude only that the insured suffered no harm." *Werlinger*, 120 P.3d at 595.

### 2. Plaintiff's Bad Faith and CPA Claims Fail for Lack of Evidence of Uncompensated Harm

Greenwich argues that National Union has failed to establish any damages proximately caused by Greenwich's alleged bad faith or violation of the CPA that have not already been compensated by the Court's previous rulings. (Def. MSJ 4 (Dkt. No. 67).) In its motion for summary judgment, National Union seeks a determination that Greenwich's conduct constituted bad faith and violated the CPA. (Pl. MSJ 2 (Dkt. No. 68).) However, even assuming that Greenwich acted in bad faith and the presumption of harm applies, National Union's bad faith and CPA claims fail as a matter of law because any damages caused by Greenwich's conduct have already been awarded to National Union, the insured's assignee. The Court need not determine whether Greenwich acted in bad faith or violated the CPA because these claims otherwise fail for lack of an essential element—harm to the insured.

The Court has now determined that National Union is entitled to recover: (1) $445,690.58, plus prejudgment interest, which represents Greenwich's allocated portion of the defense costs billed by WKG pursuant to the parties allocation agreement; (2) $85,068.84, plus prejudgment interest, which represents other costs related to Harris's defense that National Union paid and may recover under equitable subrogation; and (3) reasonable attorney fees. In light of this award, the Court finds that there is insufficient evidence of any uncompensated harm suffered by Harris, or National Union as its assignee, to support a bad faith or CPA claim.

Where an insured has been awarded contractual damages against the insurer for failure to defend, summary judgment dismissal of remaining bad faith and CPA claims is warranted absent evidence of uncompensated harm to the insured. *See Ledcor Indus. Inc. v. Mut. of Enumclaw Ins. Co.*, 206 P.3d

ORDER – 9

1  1255, 1261 (Wash. Ct. App. 2009). In *Ledcor*, the trial court found that the insurer, Mutual of Enumclaw

2  ("MOE"), acted in bad faith, violated the CPA, and breached its contractual duty to defend when it failed

3  to defend Ledcor as an additional insured under its policy. 206 P.3d at 1259. The court awarded

4  contractual damages (plus prejudgment interest) for MOE's unpaid defense obligations, but ultimately

5  declined to award any damages for bad faith or CPA violations because Ledcor had not suffered any

6  damages beyond the defense costs already awarded. *Id.* The Washington Court of Appeals affirmed on all

7  grounds, finding that Ledcor had suffered no harm from MOE's bad faith or CPA violations. *Id.* at

8  1261–63. The court explained that emotional damages, such as the alleged "loss of peace of mind and

9  uncertainty," were not compensable under the CPA. *Id.* at 1262. In finding that Ledcor had not been

10  harmed or prejudiced beyond the unpaid defense costs, the court emphasized that Ledcor had never lost

11  control of the case because, although MOE failed to defend it as required, Ledcor's own insurance

12  carriers provided a competent defense and settled the matter. *Id.* at 1261, 1263. The court noted that

13  "Ledcor ultimately received what it was entitled to," and "was at all times . . . represented by competent

14  counsel who aggressively defended Ledcor's interests." *Id.* at 1261. Accordingly, the court affirmed that

15  Ledcor's damages were limited to recovery of the unpaid defense costs owed by MOE. *Id.* at 1264.

16      Here, as in *Ledcor*, the Court has already awarded damages to National Union (as Harris's

17  assignee and subrogee) to reimburse it for the defense costs owed by Greenwich as the primary insurer.

18  And, like the insured in *Ledcor*, Harris received a competent defense throughout the litigation, even

19  though a billing dispute arose between its insurers as to who was responsible for the defense costs.

20  Despite the ongoing billing dispute, WKG continued to provide Harris with an aggressive defense and

21  managed to obtain a favorable settlement on Harris's behalf.[5] In addition, although Greenwich was no

22

23      [5] Prior to the substitution of WKG as defense counsel, the plaintiffs in the underlying litigation

24  had ended an unsuccessful mediation by demanding $6.7 million for settlement. (Claim File Notes (Dkt. No. 25-2 at 63).) During the second week of trial, WKG negotiated a $3 million settlement, which was

25  significantly less than the plaintiffs' most recent demand of $7.5 million. (*See id.*).

26  ORDER – 10

longer paying WKG's bills, it confirmed that WKG would continue to defend Harris and offered to provide Harris with independent counsel to address the billing dispute. (Email string, Dec. 22, 2005, through Jan. 6, 2006 (Dkt. No. 25-3 at 15–18).) The record shows that the billing dispute had no appreciable impact on the adequacy of Harris's defense or the successful settlement of the case. Greenwich has therefore rebutted any presumption of harm by showing the complete absence of any cognizable, uncompensated harm suffered by Harris. National Union, for its part, has failed to identify any actual harm to Harris.

Recognizing the need to establish harm to withstand summary judgment, National Union attempts to identify specific harm suffered by Harris. (Pl. Resp. 9 (Dkt. No. 73).) Nation Union contends that Greenwich's refusal to continue paying Harris's defense costs (1) placed Harris "in the awkward position of having to be concerned about the continuity of its defense," (2) created "a risk that WKG would withdraw from the case," and (3) caused Harris to incur "fees and costs for responding to Greenwich's various discovery requests and other activities in this lawsuit." (*Id.* at 10–11.) However, none of these alleged damages identified by National Union is sufficient to create a triable issue as to whether Harris has suffered any cognizable "harm or prejudice" from Greenwich's conduct.

In light of the Court's award for reimbursement of defense costs, the mere uncertainty as to whether WKG would continue representation during the billing dispute is insufficient to establish cognizable harm to maintain a bad faith or CPA claim. In *Ledcor*, the court found that "loss of peace of mind and uncertainty" caused by the insurer's failure to defend were insufficient to maintain a bad faith or CPA claim after the insured had been awarded contractual damages. 206 P.3d at 1262–63. National Union cites *Mutual of Enumclaw Insurance Co. v. Dan Paulson Construction Inc.*, 169 P.3d 1 (Wash. 2007), in support of its assertion that Harris has suffered cognizable harm. However, *Dan Paulson* is readily distinguished from the instant case because there, unlike here, the insured "los[t] control of the case" when the insurer's declaratory action interfered with the underlying arbitration by "interjecting insurance coverage issues into the arbitration." *See id.* at 11–12. In *Dan Paulson*, the court emphasized

ORDER – 11

that "loss of control of the case is in itself prejudicial to the insured." *Id.* (citation omitted). No such loss of control occurred here. Harris maintained competent representation by WKG, which continued to adequately defend it and obtained a favorable settlement in the midst of trial. *Cf. Ledcor*, 206 P.3d at 1261 (finding that insured never lost control of the case and did not suffer harm where it was continuously represented by competent counsel). Harris's uncertainty does not constitute sufficient harm to withstand summary judgment.[6]

In addition, the costs incurred by Harris to comply with discovery requests in this case cannot constitute "damages" in the underlying litigation to support a bad faith or CPA claim. These alleged discovery damages are simply costs incurred by Harris in complying with this Court's previous order granting Greenwich's motion to compel. (*See* Nov. 2008 Order 7 (Dkt. No. 43).) And any expenses incurred by Harris in complying with Greenwich's discovery requests are indemnified by National Union by the settlement agreement in which Harris and WKG assigned their rights to National Union in exchange for payment of the outstanding defense costs. (*See* Assignment (Dkt. No. 30-3 at 9–11).)

Because the Court has already awarded reimbursement for Greenwich's breach of its defense obligations, and because Harris "ultimately suffered no harm resulting from Greenwich's breach of its duties," National Union's remaining bad faith and CPA claims fail as a matter of law. *See Ledcor*, 206 P.3d at 1261; *see also Werlinger*, 120 P.3d at 596 (finding summary judgment dismissal of bad faith and CPA claims warranted where insurer established that insured had suffered no harm). Even assuming that Greenwich breached its duty of good faith, the Court has already awarded sufficient damages to provide an appropriate remedy for such a breach under these circumstances. *See Ledcor*, 206 P.3d at 1261 ("The remedy for insurer bad faith is compensation for the harm caused thereby and estoppel as to policy defenses to the claim."). At bottom, this case involves a dispute between an excess and primary insurer

---

[6] Although this Court previously found that the billing dispute caused harm to Harris, it did so in the context of finding that sufficient harm existed to support National Union's contractual claims, for which damages have now been awarded. (*See* Feb. 2009 Order 8–9 (Dkt. No. 64).)

ORDER – 12

over responsibility for the costs incurred in defending their co-insured, and the Court has now determined the proper allocation of these costs.

## IV.   CONCLUSION

For the foregoing reasons, the Court hereby finds and rules as follows:

(1)   Plaintiff's Motion for Summary Judgment (Dkt. No. 68) is GRANTED IN PART AND DENIED IN PART. The Court finds that National Union is entitled to recover defense costs from Greenwich in the amount of $530,760.42, which represents $445,690.58 in costs paid to WKG and $85,069.84 in defense costs incurred on Harris's behalf and paid directly to vendors. The Court declines to determine whether Greenwich's conduct constituted bad faith or violated the CPA as a matter of law because these claims otherwise fail for lack of an essential element—harm to the insured.

(2)   Defendant's Motion for Summary Judgment (Dkt. No. 67) is GRANTED. National Union's remaining claims for bad faith and violation of the CPA are DISMISSED for lack of evidence of uncompensated harm suffered by the insured.

(3)   The Court can discern no remaining, viable issues that would warrant a trial in this case. Therefore, the Court believes the following motions are now moot: Plaintiff's Motion to Disqualify Defendant's Counsel (Dkt. No. 27), Plaintiff's Motion to Quash Subpoenas (Dkt. No. 51), Plaintiff's Motions in Limine (Dkt. Nos. 46 & 54), Defendant's Motions in Limine (Dkt. No. 48), and Defendant's Motion to Compel Trial Attendance (Dkt. No. 49). The parties are directed to meet and confer within ten calendar days of this Order and provide the Court with a joint status report on whether a trial is still necessary.

SO ORDERED this 22nd day of June, 2009.

John C. Coughenour
UNITED STATES DISTRICT JUDGE

ORDER – 13